UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 20 CR 812-4 |
| v. | ) | |
| | ) | |
| JAY DOHERTY | ) | Honorable Manish Shah |
| Defendant. | ) | |

## JAY DOHERTY'S SENTENCING MEMORANDUM

**I.    Introduction**

Jay Doherty dedicated his life to serving others, guided by his upbringing, his religion and his morals. This commitment to community and service supported a successful career in lobbying and consulting and earned him a reputation as a humanitarian in Chicago. Jay was an integral and essential part of three of the most respected and honorable institutions in Chicago—the City Club, Misercordia and Special Olympics. He was a bright light in the most respected areas of Chicago. However, over time, this quality of always wanting to serve, always wanting to please, turned like a boomerang and ultimately became the character defect which resulted in the tragedy of this case. Once an active member of the community, devoted husband, and father of four, Jay's life has changed dramatically—his wife and children have left Illinois, he has lost his income and assets, his business has closed, and he now relies on friends for financial support. His formerly impeccable reputation is decimated.

18 U.S.C. Section 3553(a) requires that a sentence not be greater than necessary to serve sentencing principles, including generating respect for the law. This case, this conviction, this sentence—should focus on a respect for the law, not just from the perspective of retribution but also from the perspective of fairness. Here, fairness dictates that once a man's entire life is

ruined, once he has been under court supervision for five years, where he has displayed no indication he will recidivate, where the case is based upon everchanging legal principles, where there is no purpose to be served from incarceration, respect for the law suggests an non-custodial term, so that this tragedy can finally be put to an end. Jay respectfully request a non-custodial sentence.

## II. Sentencing Guidelines

### A. Doherty Guideline Calculations

The parties agree that Jay is a criminal history category I. (PSR, ¶65, GVOO, p. 19) The guidelines have been calculated in the following manner.

| USSG | PSR (Dkt. 422) | Doherty VOO Calculation | Government VOO Calculation (Dkt. 422, p.19) | Relevant Court Calculation[1] (Dkt. 453) |
|---|---|---|---|---|
| §§2X1.1(a) & 2B1.1(a)(1) Base | 7 | 7 | 7 | 7 |
| Specific Offense Characteristic (Loss) §2B1.1(b)(1) | $0 +0 | $0 +0 | $150,000,000 +26 | +more than $550,000 (p.19) +14 |
| Sophisticated Means §2B1.1(b)(10) | +0 | +0 | +2 | Not Yet Determined |
| §4C1.1(a)(1) Zero-Point Offender | -2 | -2 | -2 | Not Yet Determined |
| Total Offense Level | 5 | 5 | 44 | |
| Rec. Range: | 0-6 months | 0-6 months | Life in Prison | |

### B. Loss Amount

---

[1] Doherty recognizes that certain of the calculations will likely be consistent across defendants, such as loss. Sophisticated means, however, is a defendant-specific enhancement which should not be applied to Doherty. Doherty preserves his arguments regarding loss as reflected in his PSR and incorporates those arguments here by reference.

2

-
-
-
-

Jay joined the other defendants' legal and factual arguments regarding loss amount. (Dkt. 422, PSR, Attachment: Defendants' Joint Submission Regarding Loss, p. 122) Probation agreed with defendants' analysis and declined to find any loss associated with the offense. (Dkt. 422, ¶53) This Court has made a ruling on this matter in the sentencing of co-defendant Hooker. (Dkt. 453, p. 19-20) Jay incorporates by reference his arguments submitted to probation and agrees with probation's calculation of loss.

### C. Sophisticated Means

Doherty agrees with probation that the two-level enhancement the Government seeks for sophisticated means does not apply. The Government does not provide an individual analysis of Doherty's conduct as to why this enhancement is appropriate. (Dkt. 422, GVOO, p. 13) Instead, the Government states that "…the caused off-the-books payments to be made through nominees to Madigan's political associates…" *Id.* "Defendants cause the creation of phony contracts, invoices, internal approvals, and false entries in accounting records for the purpose of concealing the illegal activity; and shifted payments between various nominees as circumstances required." *Id.* The PSR did not adopt this position. (Dkt. 422, ¶53)

"Sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. §2B1.1, Note 9(B). Specifically, the enhancement looks to how a particular defendant intentionally engaged in or caused the conduct constituting sophisticated means—it is the defendant's own conduct, not the scheme overall that dictates the enhancement. *United States v. Griffin,* 76 F.4th 724, 751 (7th Cir. 2023). As this Court has noted, the enhancement does not require a brilliant scheme; just one that displays a greater level of planning or concealment than the typical offense of its kind. (Dkt. 453, p. 20-21) *citing, see, United States v. Kowalski*, 103 F.4th 1273, 1278 (7th Cir. 2024) (the essence sophisticated is deliberate steps to make the offense difficult to detect). This Court has found that the underlying

hires of subcontractors on behalf of Madigan and its execution was a creative arrangement as to the ComEd insiders. *Id.* But, as to Jay—the evidence was overwhelming and uncontradicted that his contracts and invoices were standard, typical—not creative, not creatively designed to conceal a larger crime. The contracts and invoices Doherty submitted to ComEd, which did not list the subcontractors, mirrored all of Doherty's other contracts (which also did not list subcontracotrs). (TT, 2938 (Gallegos testified that Jay used a standard contract and invoices and did not include subcontractors on any of his contractors or invoices); *see* DX 3091, 3092, 3093, 3094, 3095). Indeed, there was no evidence that Jay hid anything from anyone at ComEd or anywhere else—rather, ComEd employees not involved in the alleged conspiracy were aware of the subcontractors. (TT, 1541, 4-16 (Parker testified she knew of at least two subcontractors on Doherty's contract); DX3009 (an email with Parker and five other ComEd employees discussing putting Moody on a subcontract with JDDA); TT, 2944 – Gallegos testified Parker was aware of the subcontractors). And, the testimony at trial was that ComEd employees understood that subcontractors were not to be listed on contracts. (TT, 2357:13-20 (subcontractors should not be listed in contract agreements); 3351:21-3353:13 (it was inappropriate to include a subcontractor in a contract)).

Moreover, it is a mistake and against the evidence, to conclude that Jay knew the subcontractor-lobbyists[2] were hired as ghostworkers—so that the contracts were a complete

---

[2] The evidence was overwhelming that each of the individuals hired had experience in Chicago and Cook County government. (Marquez, TT 1970: Olivo and Nice did not have the skills that suggested they should be hired by ComEd. *But elf* Marquez, TT 2358: Marquez looked for lobbyists with experience in government relations; Lobbyists are hired based on their relationships. Marquez, TT 1896-97: Olivo was an ex-Alderman that Marquez had met when he worked in external affairs for ComEd; Marquez, GX-0129T: Nice and Moody worked in Cook County government; Marquez, TT 2409: Marquez intended to use Zalewski, an ex-Alderman, as a lobbyist and thought it was a good idea to have him contracted under Doherty because Zalewski would lobby on city and county issues. Stipulation, TT 1737, Nice worked for the Clerk of the Circuit Court, 1992-1993, and the Cook County Recorder of Deeds, 1993-2001. Moody, TT 3778, Moody had good relationships with many politicians that were built over the course of twenty years. TT: 3779: Moody testified he was well-qualified for the lobbying job he was hired to perform.).

façade. (TT, 4802-4804 (Hooker called Doherty and told Doherty the Speaker had two referrals he wanted [ComEd] to consider hiring for lobbying positions; they wouldn't work in Springfield; they had city and county experience. Hooker never told Doherty that these hires would do not work. Hooker did not want the hires to work on Doherty's other business. It was Hooker's understanding that either Hooker or Doherty could give them work.[3]); TT, 2408 (Marquez intended to use Zalewski as a lobbyist, it was a good idea to have him as a subcontractor to Doherty because he would lobby on city and county issues, and that was what Doherty did); TT, 1901-1904 (Marquez told Doherty ComEd was hiring Moody and putting him on Doherty's contract; Marquez never told Doherty the hires were in connection to legislation or in connection to Madigan; Marquez was responsible for city/county lobbyists; Marquez never directed Doherty to give Moody work); TT, 1953 (Marquez wanted to use Zalewski to negotiate the Chicago Franchise Agreement. Marquez did not tell Doherty Zalewski was hired in connection to legislation or in connection to Madigan's official duties. Marquez never told Doherty to give Zalewski work.) The evidence does not suggest that at their hirings, Jay knew the subcontractors were intended to be ghostworkers.

It is a false premise that Jay should have known the hires covered an underlying wide ranging bribery crime because the subcontractor's failed to perform daily tasks and record their work activities that. The testimony from the Government's witnesses confirmed that the City of Chicago and Cook County lobbyists, as the four subcontractors were, were assigned tasks on an issue-by-issue basis; and as Hooker testified, ComEd could specifically give the subcontractors

---

[3] Recall that Hooker and McClain are recorded guffawing at using Doherty to hire the subcontractors and McClain later discusses with Bradley and Marquez how to blame Doherty that the subcontractors did not do any work. GX-12; GX-122; GX123. McClain says to Hooker, "Right. We don't have to worry whether or not, I'm just making this up, whether or not Mike Zalewski, Sr., is doing any work or not. That's up to Jay Doherty to prove that… We're not, we're not, uh, monitoring his workload, whether, or not Mike Zalewski's earning his five grand a month. That's up to Jay Doherty." [Laughing] Hooker: "That's right." McClain: "That's why we set it up like this, John."

5

work. (*supra,* Hooker testimony; TT, 1821-22; 1825; 1828 (city and county lobbying work was non-continuous and occurred on an issue-by-issue basis). Therefore, the work was not daily, the work was assigned by ComEd as issues arose, and a lobbyist was needed.

In addition, the testimony at trial was overwhelming, and unrebutted, that, generally, contract lobbyists do not perform daily tasks. (TT, 4124, 4188-89 (Dominguez); 2723 (Marquez-Dominguez recording); 1441-41 (O'Neill)). And, this was not just ComEd contract-lobbyists, or Illinois contract-lobbyists, but rather it is the lobbying business in general. (Dkt. 230-1, (Proffer of Dr. Drutman, Lobbying Expert. "Job referrals by political figures to public companies with business before the political body is commonplace." "[t]here are various different contracting means to hire a lobbyist." "Contract lobbyists are typically hired on a retainer basis, provided a monthly fee not necessarily dependent on the amount of work performed." It is typical for a company not to require any work product from a contract lobbyist. "…the typical pay for a lobbyist would be between $5,000 and $20,000 a month on retainer." "[The amount] is not dependent on the work performed… companies are put in a position where they are required to have a lobbyist on hand should any situation arise which requires particular and specific relationships. Hiring of lobbyists is prospective…based on the information currently available.") Long periods of time could pass without any work assigned and, from Jay's perspective, there could have been work assigned without Jay knowing.

Moreover, Jay worked hard and did not specifically record his time, thus he would have had no reason to suspect anything about the subcontractors failing to record their work or time. (TT, 2924; 2953; 2944 (no one at ComEd ever requested Doherty provide a detail of work performed and Doherty did not do so for his other clients.) That the subcontractors did not record

6

daily work, or include the specific work performed on their invoices, through the lens of Jay, did not suggest an underlying criminal endeavor.

In a prior ruling, the Court cited a false statement by Jay in support of direct liability for the false records counts. Dkt. 426, p.10. That ruling is final, and Jay does not wish to contradict the Court. However, it is important to understand that the record also suggests that Jay did not know the statement was false. The particular statement cited was a 2018 contract in which Jay, where Jay states that the increase of his pay was due to an "expanded rule with Cook County." This was put in Jay's contract at the direction of a non-coconspirator at ComEd, GX 769 (Duray email where he advises Gallegos to amend the contract to include an "expanded scope"); TT, 2952 (Gallegos spoke with Duray and advised that the increase was related to a subcontractor). In fact, Hooker and McClain discussed amongst themselves that Zalewski could lobby for Cook County and the City of Chicago—no doubt what was communicated to Jay. (GX12-T, McClain: "Alderman Zalewski… him working City Hall and the count, uh, for us.. I think everybody likes him.") And, Zalewski registered as a lobbyist for Cook County. (DX 3083)

Moreover, Marquez testified that he hired Zalewski, a recently retired Alderman, to assist with the Chicago Franchise Agreement, a matter that had not been addressed in 20 years and was extraordinarily important to ComEd's revenue. (TT, 1953) Ultimately, the evidence supports a finding that Jay was told Zalewski would lobby Cook County and the upcoming City of Chicago franchise agreement. While Jay respects this Court's ruling, an assessment of the full record related to this fact bears on a determination regarding sophisticated means.

Jay's action here were not sophisticated, and the sophisticated means enhancement does not apply.

**D.     Total Offense Level and Recommended Guideline Sentence**

Jay agrees with probation, his total offense level is 5, his criminal history category is I, and his recommended guideline range is zero to six months.

**III.    Statutory Maximums**

As Doherty presented in his prior version of his offense, the statutory maximum in his case is probation, or non-imprisonment because Doherty established during trial that he had no knowledge of 15 USC §78ff(a) or §78m(b)(5).

Under 15 U.S.C. §78ff(a), which covers both i) knowingly and willfully circumventing a system of accounting controls to falsify any book, record and account of Exelon and ComEd under §78m(b)(5); as well as, ii) willfully and knowingly making, or causing to be made, *any statement in any report or document required to be filed under Chapter 2B* pursuant to §78ff(a), "…no person shall be subject to imprisonment… if he proves he had no knowledge of such rule or regulation." (emphasis added) The "no knowledge" safeguard is not dispelled simply because the defendant pled guilty or was convicted of willfully violating the provision at issue. *See*, *United States v. Behrens*, 644 F.3d 754 (2011) *citing United States v. O'Hagan*, 521 U.S. at 651, 665 (1997) ("To establish a violation of Rule 10b-5 [promulgated pursuant to the Exchange Act], the Government must prove that a person "willfully" violated the provision. See 15 U.S.C. §78ff(a). Furthermore, a defendant may not be imprisoned for violating Rule 10b-5 if he proves that he had no knowledge of the rule.")

The no-knowledge defense is one of two scienter safeguards (willfully and the 'no knowledge' provision) to curtail overbreadth of the application the Exchange Act, including the Federal Corrupt Practices. *Behrens*, 644 F.3d at 756; *See also, Reyes*, 577 F.3d 1069 (2009) (willfully in the context of books and records means the defendant knew of the falsification, not

8

that he knew of the securities laws; the "no knowledge" provision requires the defendant to establish that he was unaware of the SEC rule or regulation prohibiting the falsification of books and records). Here the no knowledge rule applies, because the provisions at issue, require Doherty's knowledge of the internal accounting systems and controls at ComEd; as well as the documents and reports that were required to be filed under Chapter 2B. Application of the rule to Doherty is not only consistent with the law, it makes practical sense. To swirl individual businessman into the FCPA rules and regulations by way of a large corporations financial honesty requirements, suggests gross unfairness. Employees in large corporations are given the benefit of professional training and education as to the rules and regulations—individuals like Doherty would be entirely dependent on those employees not only interpreting the rules accurately but communicating them clearly, so that an individual contractor does not get swirled into corporate malfeasance or negligence. This most certainly is why the safe harbor exists, and it is also why it's application to Doherty is necessary.

  Doherty established that he had no reason to know of either the internal accounting systems at ComEd or the records and documents required to be filed as part of Chapter 2B of the FCPA. Doherty was not an officer or executive at ComEd or responsible for any of ComEd's financial reporting. Doherty never signed a code of conduct policy and was never briefed on or received any such policy. No one at ComEd ever informed Doherty of any of its internal accounting procedures or its obligation to adhere to any securities law provisions, or any of the documents or reports required to be submitted to the SEC. As stated, despite knowing that there were subcontractors on Doherty's contract, and that ComEd had certain financial reporting requirements, no one at ComEd ever advised Doherty to include the subcontractors on his contracts and invoices. (Parker, 1541-42 (knew of at least two subcontractors on Doherty's

9

payroll): 1544-45 (the following people knew of Doherty subcontractors: Dipego (Marquez assistant), Colvin (legislative affairs), Guerra (legislative affairs-an attorney), Owens (legislative affairs), Fabris (accounting department); Tagaki (Frank Clark's assistant). Again, as stated, one ComEd employee, Eric Duray, specifically advised a general contractor not to put subcontractors on the contract with ComEd. (Duray, 3349; DX 3024, 3025) Gallegos, Doherty's bookkeeper and administrative assistant, at one point spoke with Duray and told him that the increase for the Zalewski contract was related to a subcontractor. (Gallegos, 2952). These communications were all with non-conspirators—and no one at ComEd ever advised that Doherty should amend his contracts and/or invoices.

In addition, Gallegos, who performed all of Doherty's administrative activities including drafting and submitting all invoices and contracts to JDDA clients (TT, 2920), testified that she kept all of Doherty's books, and neither she nor Doherty had access to ComEd's accounting system; she was not familiar with ComEd's accounting system; and if someone from ComEd had told her to draft the contracts and invoices differently, she would have done so. (Gallegos, 2946-47) Gallegos further testified that Doherty told her, in keeping the books, to make sure she was doing everything correctly, make copies of everything, and keep appropriate records. (Gallegos, 2932) Doherty never told Gallegos to skirt the rules, change a document or take advantage of the gray area—or to keep anything secret. *Id*. Doherty insisted that she do everything "by the book." *Id*. Doherty never took any accounting classes, and she would have known if Jay had ever taken an accounting class. (Gallegos, 2946-47) JDDA was not a publicly traded company, it was a small business he ran for thirty years. (Gallegos, 2920, 2946) Jay never worked at a company or firm that sold securities and was never subject to any internal business practices and compliance training which would have subjected him to any securities law.

Doherty had no knowledge that §78m(b)(5) of §78ff(a) required publicly traded companies to implement internal accounting procedures and to file certain documents or records or risk criminal punishment. Because Doherty has established by a preponderance of the evidence that he had no knowledge, nor any reason to have any knowledge, of §78m(b)(5) or §78ff(a), his statutory maximum is no imprisonment.

## IV. A SENTENCE BELOW THE ADVISORY GUIDELINE RANGE WILL SERVE THE FACTORS OUTLINED IN 18 U.S.C. § 3553(A)

Courts seek to impose a sentence that is "sufficient, but not greater than necessary," to promote the goals established and codified by Congress. 18 U.S.C. § 3553(a). To determine a sentence that is sufficient, but not greater than necessary to fulfill the purposes of sentencing, § 3553 directs consideration of several well-known factors. 18 U.S.C. § 3553(a); see *United States v. Johnson*, 471 F.3d 764, 766 (7th Cir. 2006) ("the statute does not weigh the factors . . . that is left to the sentencing judge, within the bounds of reason, which are wide.").

A Court may sentence outside the Sentencing Guideline range as long as all of the § 3553(a) factors are considered. Indeed, it is the district court's duty to "make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration of) the advice of the Guidelines" if the result they suggest does not comport with the sentencing court's view of an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring). The Supreme Court has rejected outright the notion that "extraordinary" circumstances must exist to justify a sentence outside the advisory Guideline range, including cases in which courts depart significantly from advisory guideline ranges to impose a non-custodial sentence. *Gall v. United States*, 552 U.S. 38, 47 (2007) (finding district court's departure from advisory guideline range of 30-37 months to impose sentence of probation was not an abuse of discretion).

11

A. **History and Characteristics of the Defendant**

Evidence of a defendant's history and characteristics "is clearly relevant to the selection of an appropriate sentence." *Pepper v. United States*, 131 S. Ct. 1229, 1242 (2011) (citing § 3553(a)(1)). *Pepper* emphasized that a sentencing court must "'consider every convicted person as an individual,'" *Pepper*, 131 S. Ct. at 1240 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)), and must fashion a punishment that "fit[s] the offender and not merely the crime," *Pepper*, 131 S. Ct. at 1240 (citations omitted).

Jay Doherty grew up in Illinois and has made Illinois his home. He is one of ten children raised his father, a pharmacist, and his mother, a homemaker. His family lived a modest life. Jay is well-known as a man who lived for others, as he was taught by the Jesuits. More than seventy people have written the Court to describe the man that they love, honor and admire. The letters come from people from all walks of life. Jay was integral in supporting the mission of organizations that exist to serve the public, the City Club of Chicago, Misericordia, and the Special Olympics. The letters submitted on his behalf detail the extraordinary good deeds that Jay has selflessly done throughout his life. He even gave a friend a kidney when they needed it. *Letter from John F. Ferraro*, dated October 2, 2023, attached as part of Group Exhibit A. The letters are replete with acts of kindness, mercy and generosity in both large matters and small. These letters show the man who Jay Doherty has been throughout his entire life, not the limited conduct in this case that is entirely inconsistent with his true character. His true character, shown by the letters, is that of a man with integrity and motivation to serve others.

Jay has lived his life in service to others by supporting civic and charitable organizations through significant volunteering and fundraising. The City Club of Chicago is a bipartisan civil organization, which has existed for over 100 years and was wildly

recognized as Illinois' premier public affairs forum. Jay was the volunteer president for 27 years. During his time as president of the City Club, Jay helped foster critical debate and civic engagement to help strengthen the Chicago area by convening civic minded individuals in the public, private and nonprofit sectors. He helped secure excellent speakers in this role, including Presidents, Senators, Mayors and other political leaders from both political parties as well as significant business leaders. Sister Rosemary Connelly, executive director of Misericordia, an organization that provided care for countless individuals who needed help, also spoke at City Club and built a relationship with Jay. Before her death, the late Sister Connelly, as close to a saint as the City of Chicago has ever had, shared that Jay was "among Misericordia's many blessings as he always kept our residents near and dear with respect to his charitable efforts throughout the years." At the time, Sister Connelly noted that, "Jay is blessed with his loving wife Colleen and four beautiful children – Jay Jr., Ignatius, Rosalie and Joseph. It was the birth of Jay's daughter, Rosalie, which brought Jay to Misericordia, as Rosalie was born with Down syndrome. Jay would say that Rosalie has made him a better person, and I know that is why he such a great advocate for children and adults with intellectual and developmental disabilities." Sister Connelly noted Jay's help raising hundreds of thousands of dollars for Special Olympics and Misericordia over the years. Sister Connelly closed with her reflection that, "Misericordia is a better place because of Jay Doherty." *Letter from Sister Rosemary Connelly, RSM*, dated January 23, 2024, attached as part of Group Exhibit A. It is hard to imagine receiving a better award to be given than one that thanks the recipient for helping life's most vulnerable people to live "lives of dignity, respect, challenge and beauty."

In addition to his broader civic and charitable work, Jay was a good friend. Retired Chicago Firefighter Danny Ahlfeld shared how Jay changed his life by supporting him through the lowest time in Mr. Ahlfeld's life. *Letter from Danny Ahlfeld*, dated December 2, 2023, attached as part of Group Exhibit A. John Harris, another friend, shared how Jay unselfishly helped to jump in to help a family that tragically lost their daughter. Mr. Harris shared "That's who Jay is at his core. He tries to help whomever he can, however he can." *Letter from John Harris*, dated October 4, 2023, attached as part of Group Exhibit A. As Jay's friend Christopher Doolin shared with the Court, Jay is a man who lived for others. *Letter from Christopher Doolin*, undated, attached as part of Group Exhibit A. Thomas Lanctot echos this same sentiment, sharing how Jay has been a "man for others." *Letter from Thomas E. Lanctot*, dated September 17, 2023, attached as part of Group Exhibit A.(emphasis added).

Jay has always prided himself on being a loving and devoted father and husband, even though his family life has been shattered because of his actions at issue in this case. Nancy Gianni, the founder of GiGi's Playhouse Down Syndrome Achievement Center and a friend of Jay's, writes of Jay's unwavering love and commitment to his family: "My first encounter with Jay Doherty occurred when he and his wife were facing a prenatal diagnosis of Down syndrome for their daughter, Rosalia. They were being told to terminate the pregnancy and given no hope. In immense distress, they reached out to GiGi's Playhouse for assistance. I vividly recall the day when I met Jay, his wife, and their young son at GiGi's Playhouse. Amid tears and uncertainty, Jay's unwavering love and commitment to his family shone brightly." Ms. Gianni went on to share how Jay has supported her over the years: "Jay's generosity and selflessness know no bounds. He frequently put the needs of others ahead of his own, readily extending a helping hand to friends and acquaintances in need. His presence and support have been instrumental in my

14

own moments of doubt and struggle. Jay's steadfast belief that challenges are meant to be overcome and his unshakable faith in God's guidance were a constant source of inspiration for me." *Letter from Nancy Gianni,* attached as part of Group Exhibit A.

These examples only scratch the surface of the multitude of letters written to the Court in support of Jay Doherty. The numerous people who wrote in support of Jay told stories of a man who has lived an exemplary life of generosity and service to others. Jay Doherty is not characterized by his desire for a "flashy" lifestyle or "material" needs. Instead, he values time with people and close relationships. He understands how hard the world can be, and never forgot that in forging his relationships. The letters show Jay's true character. He is a good and kind person who selflessly helped others time and time again.

**B.      Offense Conduct**

Because the Court is familiar with the nature and circumstances of the offense, counsel will not belabor the facts and legal arguments again here. Setting aside the heavily litigated legal issues, Jay recognizes that his conduct in this case was not consistent with his core values of serving the public. Somewhere along the way, his focus on civic engagement and public service turned into glad-handing, seeking to curry favor and impress others. Still, the letters show that this isolated conduct is inconsistent with who Jay is as a person and his lifetime of good works. Jay respectfully requests that the Court view the offense conduct as the abnormality it is when viewed within the entirety of his life of service to others.

**C.      The need to reflect the seriousness of the offense, provide deterrence, and take into account the types of sentences available.**

It is not hyperbole to say that Jay Doherty's life was shattered based on the conduct and charges in this case. He lost his family. Jay is now divorced and his children live across the country, without any interest in speaking to him. He lost his means of making a living. For the

15

rest of his life, he will struggle to find work to provide for his basic needs and must turn to relying on friends to get by. He lost the respect of his community. He faces deep shame, and will for the rest of his life, for betraying those who once deeply respected him by acting in a way that was entirely inconsistent with the core values he learned as a child and growing up in Jesuit institutions. His physiologist has shared the significant negative impact on Jay's mental health that he faces every day due to his conduct. The punishment of losing the life he built for decades has been significant and will continue for the rest of Jay's life. This lifelong punishment is sufficient to serve as a deterrent to others who, like Jay, value their family and role in the community above all else.

Jay is eligible for probation, as there is no statutory minimum sentence. Given the extreme consequences Jay has faced in his personal life, and will continue to face for the remainder of his life, counsel respectfully submits that a sentence of incarceration is greater than necessary punishment.

   **D.**  **The need to avoid disparate sentences.**

The Seventh Circuit has called upon district court judges to consider the cost that the government incurs in incarcerating older individuals. *United States v. Presley*, 790 F.3d 699, 702 (7th Cir. 2015). Prisoners at least fifty years old cost the federal prison system about eight percent (8%) more than younger prisoners, and those costs only rise with age. Id. (citing Office of the Inspector General, U.S. Dept. of Justice, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, May 2015 (https://oig.justice.gov/reports/2015/e1505)). Indeed, since the pandemic and the passage of the First Step Act, the Bureau of Prisons has increasingly exercised its authority to compassionately release aging federal prisoners. Finally, recidivism rates consistently decline as age increases. *See,* U.S. Sent'g Comm'n, The Effects of Aging on

16

Recidivism Among Federal Offenders, p. 3, 22-23 (Dec. 2017). Recidivism rates are strongly correlated to age and the guidelines' ranges do not account for this fact, despite the importance of age in calculating recidivism. *United States v. Carter*, 538 F.3d 784, 791-92 (7th Cir. 2008).

## V. Requested Sentence

Courts routinely recognize that sentencing is the moment in one's life where he is to receive credit for the good he has done, and the good of his life should be weighed with the conduct in the case at hand. *United States v. Adelson*, 441 F. Supp. 2d 506, 512–15 (S.D.N.Y. 2006) ("[I]f ever a man is to receive credit for the good he has done. . . it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'"); *United States v. Cooper*, 394 F.3d 172, 177-78 (3d Cir. 2005) (affirming below-Guidelines sentence of probation and six months' house arrest where defendant's acts of charity were "hands-on" efforts that had "a dramatic and positive impact on the lives of others."); *United States v. Prosperi*, 686 F.3d 32, 34, 40, 50 (1st Cir. 2012) (affirming the district court's seven-year downward variance in sentencing defendant to six months' home confinement in $5 million fraud case based on defendant's charitable works and care for family). Jay has been under the supervision of the Court for five years. His travel was restricted to the Northern District of Illinois and all other standard conditions of bond applies. Jay asks that this restraint on his liberty be considered when fashioning a sentence that is sufficient but not greater than necessary. Counsel respectfully submits that a non-custodial sentence is sufficient, but not greater than necessary, punishment based on the factors set forth in § 3553(a).

17

DATED: July 22, 2025

                                              Respectfully submitted,

                                              _____
                                              Gabrielle R. Sansonetti

Gabrielle R. Sansonetti
LEINENWEBER, DAFFADA & SANSONETTI
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
773-716-6117
gabrielle@ilesq.com

18